IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, : <br> : <br> v. : <br> : <br> BERTHA THERESA SANTIAGO- : <br> MARRERO, : <br> : <br> Defendant. : <br> _____ : | CASE NO: <br> 7:22-cr-60-WLS-TQL-1 |

## ORDER

Before the Court is Defendant's Motion to Suppress Evidence Illegally Obtained Evidence (Doc. 56) ("Motion to Suppress"), in which Defendant Bertha Theresa Santiago-Marrero ("Santiago-Marrero") requests the Court suppress all evidence seized in a law enforcement traffic stop that occurred on September 13, 2021.

For the reasons stated herein, the Motion to Suppress is DENIED.

## I.   PROCEDURAL BACKGROUND

On December 14, 2022, a two-count Indictment (Doc. 1) was filed against Santiago-Marrero and her Co-Defendant, Jadiel Joel Cartagena-Soto[1] ("Cartagena-Soto," and together with Santiago-Marrero, the "Defendants"). The two charges in the Indictment are:

    Count One: Possession of a Firearm by a Convicted Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and 18 U.S.C. § 2, the firearm being one (1) Mossberg, Model: 500, 12 gauge pump action shotgun, Serial Number: U472035; and

    Count Two: Possession with Intent to Distribute Methamphetamine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2.

(*Id.*) The Indictment asserts the offenses occurred on or about September 13, 2021. (*Id.*) Santiago-Marrero made her initial appearance and arraignment in this Court on January 24,

---

[1] Cartagena-Soto is not a party to the Motion to Suppress and reference to him is made only to the extent necessary to the Court's decision. On June 4, 2024, Cartagena-Soto filed his Motion to Suppress Evidence Illegally Obtained Evidence (Doc. 83). The hearing on Cartagena-Soto's motion has been rescheduled for August 28, 2024.

1

2023. After a detention hearing held January 27, 2024, Santiago-Marreo was ordered detained pending trial (Doc. 37).

On September 16, 2023, Santiago-Marrero filed the instant Motion to Suppress, which includes a request for an evidentiary hearing. (Doc. 56 at 4) The Government filed a timely Response (Doc. 59), and on January 16, 2024,[2] the Court held an evidentiary hearing on the Motion to Suppress.

At the January 16, 2024 hearing, the Government presented two witnesses: Sergeant Robert Touchton ("Sgt. Touchton") and Sr. Deputy Trent Exum ("Deputy Exum" and together, the "Officers"). The Government presented one dashcam video as Government's Exhibit 1 ("Video") and sixteen photographs as Government's Exhibits 2-4 (each exhibit includes four photographs). All of the Government's Exhibits were admitted without objection, and, as relevant, are discussed below. (*See* Doc. 67)

After the Government closed its evidence, the Court apprised Santiago-Marrero of her right to testify and present evidence to the Court if she wished to do so. Santiago-Marrero was also advised that she was not required to testify, that she should discuss the matter with her attorney, but that she has the right to make that decision. Santiago-Marrero confirmed that she discussed this issue with her attorney. Defense Counsel advised the Court that Santiago-Marrero chose not to testify. The Court confirmed with Santiago-Marrero that she did not wish to testify and that no one had forced, coerced or threatened her in any way to get her not to testify. Thereafter, the Court found that Santiago-Marrero's decision not to testify was knowingly, freely, and voluntarily made. (Tr. 52:19—55:12) As Santiago-Marrero did not have any other witnesses or evidence to present, the Court closed the record in this matter.[3]

The Court scheduled the filing of post-hearing briefs. (Docs. 68, 72) The Court granted a request to extend the time to file briefs. (Doc. 71) All briefs have been filed (Docs. 75, 76,

---

[2] The hearing was initially scheduled for November 28, 2023, but was continued due to the unavailability of one of the Government's witnesses who was dealing with a family medical emergency the morning the hearing was scheduled to begin.

[3] An Affidavit and Application for a Search Warrant is attached to Santiago-Marrero's Post-Hearing Brief as Defendant's Exhibit 1 (Doc. 75-1). The warrant was obtained by Deputy Exum to search the Toyota tin which the Defendants were travelling after the Toyota was impounded. As noted above, Santiago-Marrero did not present any witnesses or evidence at the January 16, 2024 hearing and the Court closed the record at the conclusion of that hearing. As such, Defendant's Exhibit 1 has not been properly admitted into evidence and the Court will not consider it at this time.

2

77), and the Motion to Suppress is ripe for decision. This matter has been set for pretrial conference for July 9, 2024, and for trial during the Court's August 2024 Valdosta Trial Term.[4]

## II. FACTUAL FINDINGS

The following summary is taken from the Court's review of the hearing transcript, the Video, and the photographs.

### A. Testimony of Sergeant Robert Touchton

Sgt. Touchton has been employed with the Cook County Sheriff's Department ("CCSD") for about eight years and has a total of about thirty years in law enforcement. (January 16, 2024 Hrg. Tr., Doc. 69 at 5 [hereinafter "Tr. ___"]) Sgt. Touchton currently works in traffic detail in Cook County, and was also working in that capacity at the time of this incident on September 13, 2021. (Tr. 6:3—4) In performing his job, Sgt. Touchton make a lot of traffic stops. Sgt. Touchton took the call dispatch received September 13, 2021, about a small white car driving slowly on the interstate. The caller said that when the caller attempted to pass the white car, the caller thought the male driver of the white car had hit the caller's vehicle in the back end. (Tr. 6:11—21) Through updated information, dispatch passed on to Sgt. Touchton that the white car had stopped at mile marker 43 on I-75 south ("Location"). (Tr. 6:22-7:3)

In investigating the call, Sgt. Touchton observed a white Toyota Corolla ("Toyota") at the Location. As he was pulling up behind the Toyota, Sgt. Touchton observed a male driver (later identified as Cartagena-Soto) moving over the console from the driver side to the passenger side of the Toyota and a female (later identified as Santiago-Marrero) getting out of the passenger side starting to walk around to the driver side of the Toyota. (Tr. 7:12—19) When he saw this activity, Sgt. Touchton immediately called for backup before approaching the Toyota. (*Id.*) He testified that he took this step because normally when people swap seats, one of them is suspended or something is going on that is not law-abiding. (Tr. 7:20—8:3)

The Court's review of the Video clearly shows that as Sgt. Touchton drives up behind the Toyota and while Sgt. Touchton is reading the license plate number into his radio, a woman

---

[4] None of the parties has filed a motion for severance of the trial of Santiago-Marrero and Cartagena-Soto.

3

(Santiago-Marrero) exits the passenger side of the vehicle and starts around the back of the Toyota. The person (Cartagena-Soto) sitting in the driver's seat begins to slide across the console to the passenger side of the Toyota. (Video 1:13).

As Sgt. Touchton approaches the Toyota, he tells Santiago-Marrero to get back into the Toyota, gesturing toward the passenger side. Sgt. Touchton starts to approach the driver side, but has to stop and tell Santiago-Marrero to get back in the car at least three more times in a matter of seconds before she finally stays on the passenger side of the car – although she still does not get into the car. (Video 1:30 to 2:00). Sgt. Touchton then opened the driver side door of the Toyota. (Tr. 8:21—24) When asked why he opened the door, Sgt. Touchton testified that because Cartagena-Soto had moved over to the passenger seat, Sgt. Touchton had to open the door so he could see Cartagena-Soto and make sure Cartagena-Soto did not have any weapons and so he could ask Cartagena-Soto for his driver's license. (Tr. 12:23—13-2) Both Defendants told Sgt. Touchton that Cartagena-Soto was not driving the Toyota, but that Santiago-Marrero was the driver. (Tr. 8-24—9:2) Sgt. Touchton also asked for Santiago-Marrero's identification.

During the time he was talking to Defendants trying to obtain their identification information, Sgt. Touchton noticed an open bag on the driver side floorboard of the Toyota. The bag appeared to contain a little silver handgun, so Sgt. Touchton retrieved the bag and placed it on the trunk of the Toyota for security purposes. (Tr. 14:7—15:15; Video 5:27 to 5:46) Sgt. Touchton asked if Cartagena-Soto's identification was in the bag, but spent only about 15 seconds looking through the bag. (Video 5:30 to 5:45) Sgt. Touchton stated he did not spend time to examine the item he thought was a small handgun because he was trying to watch the Defendants. (Tr. 24:1—6)

Sgt. Touchton left the bag on the trunk of the car and tried again to obtain the Defendants' identification information. The Defendants continually stalled and would not give Sgt. Touchton their identification information or drivers' licenses. (Tr. 8:23—9:10) Cartagena-Soto spoke some English, but Santiago-Marrero continually answered Sgt. Touchton's questions directed to Cartagena-Soto. (Tr. 26:3—21; 27:16—25) She eventually told Sgt. Touchton that Cartagena-Soto did not have any identification with him. Santiago-Marrero advised Sgt. Touchton that Cartagena-Soto lived with her in Florida. (Tr. 13:18—21; 14:24—

4

15:4) Santiago-Marrero told Sgt. Touchton that she and Cartagena-Soto had driven "up" from Chicago and that she had allowed him to drive because she was tired. Santiago-Marrero further told Sgt. Touchton that while Cartagena-Soto was driving, he got tired, and the car started to veer so she told him to pull the car over. (Tr. 15:22—16:1; Video 7:00 to 7:38)

The Video reflects that Sgt. Touchton was not able to obtain the identification of both Defendants until approximately seven minutes into the traffic stop. (Tr. 9:8—13; Video 8:30) About the time Sgt. Touchton finally obtained the Defendants' identification information and while he was calling in the information to dispatch, Deputy Exum arrived at the Location. (Tr. 15:22—16:13)

Dispatch informed Sgt. Touchton that both Santiago-Marrero's and Cartagena-Soto's drivers licenses were suspended and that Cartagena-Soto had an outstanding warrant from Wisconsin. (Tr. 25:21—24)

### B. Testimony of Sr. Deputy Trent Exum

Deputy Exum has been with the CCSD for twenty-four years and is the senior deputy and head of the road patrol. (Tr. 29:8—12) Deputy Exum's training and experience includes: extensive training in interdiction and drug paraphernalia off the interstate and back roads; a state certified marijuana ID specialist; training in detecting the odor of marijuana; identifying on sight marijuana, heroin, and methamphetamine. Deputy Exum stated he had made hundreds of arrests for marijuana possession. (Tr. 29:20—30:15) Deputy Exum responded to Sgt. Touchton's call for backup on September 13, 2021.

When he arrived at the Location, Deputy Exum testified that Santiago-Marrero was sitting in the driver seat and Cartagena-Soto was in the passenger seat. Deputy Exum stated that Defendants kept wanting to get out of the car even though they were told several times to sit down. Sgt. Touchton relayed to Deputy Exum that both Santiago-Marrero and Cartagena-Soto had "been real jumpy the whole time and he [Sgt. Touchton] was worried about what was going on." (Tr. 30:23—31:3)

While the officers were talking, Santiago-Marrero gets out of the car and attempts to remove the black bag from the trunk of the Toyota. She is stopped by Sgt. Touchton and told again to get back in the Toyota. (Video 10:45) Deputy Exum searches through the black bag, removing what was thought to be a small silver pistol which turned out to be a lighter. On

5

cross examination, Deputy Exum acknowledges that after he removed what appeared to be a small pistol but which upon examination was recognized to be a lighter, he then removed other items, identified as a glass pipe and a pack of rolling papers, and placed them on the trunk of the car. (Tr. 41-43; Video 10:53 to 12:46)

Deputy Exum testified that because the 911 caller said that the vehicle hit them in the back, he attempted to go up front to see if there was any damage on the front of the car. On his way to the front, Santiago-Marrero got out of the driver seat and he stopped and talked to her. While standing by the open driver side door, Deputy Exum stated he could smell marijuana. (Tr. 31:16—22) Deputy Exum went on and checked for damage to the front of the vehicle, but found no damage. (Tr. 45:19—21)

After Deputy Exum smelled the marijuana, he and Sgt. Touchton conferred. Both officers believed the driver, Cartagena-Soto, might be under the "influence of something." (Tr. 32:1—5) Deputy Exum attempted to call state patrol because they usually handle DUI cases and he also attempted to call out the county drug detection dog. Neither was available, and Deputy Exum decided, based on the odor of marijuana that he had smelled, that probable cause existed for the officers to "search the vehicle to see if they was any other illegal narcotics or any weapons or anything in the car." (Tr. 32:5—33:3)

Defendants were removed from the Toyota to stand in front of Sgt. Touchton's vehicle. While Deputy Exum conducted the search, Sgt. Touchton kept a watch on the Defendants. During his search, Deputy Exum located a small, locked black case from which he could smell a strong odor of marijuana, numerous torches and a glass pipe generally used with narcotics, small baggies of marijuana and/or baggies with marijuana residue inside. Deputy Exum also searched the trunk where he found a shotgun and a large bag of marijuana. (Tr. 33-34) It is undisputed that neither Defendant gave consent for Deputy Exum to search the Toyota.

During Sgt. Touchton's testimony, he was asked whether he also smelled the marijuana. He testified that he had not smelled the marijuana because he has very bad sinus problems. (Tr. 16:14—20)

Deputy Exum further testified that in situations where a driver with a valid license is unavailable to drive the vehicle, the vehicle will be towed and impounded. Prior to towing the

6

vehicle, the policy is to inventory its contents. As there was no one available to drive the Toyota, it was impounded and a search warrant was obtained to conduct a search. During that search, Deputy Exum testified that they found a bit of white powder on the dash that tested positive for methamphetamines and hidden underneath the radio console they found a Ziploc bag that contained a large amount of methamphetamines. (Tr. 36-37)

### III. LAW AND ANALYSIS

The Fourth Amendment of the Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "We have made clear that '[t]he individual challenging the search bears the burdens of proof and persuasion.'" *United States v. Mobley*, 808 F. App'x 899, 901 (11th Cir. 2020) (quoting *United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998)); *see also United States v. Jackson*, 618 F. App'x 472, 474 (11th Cir. 2015) ("The proponent of a motion to suppress has the burden to allege, and if the allegations are disputed, to prove, that his own Fourth Amendment rights were violated by the challenged search or seizure.").

#### A. The Initial Detention Was Lawful

When Sgt. Touchton arrived at the Location, the Toyota occupied by Defendants was stopped on the side of the interstate. Regardless of whether this encounter is characterized as a "traffic stop" or a "Terry stop," the analysis is the same. *United States v. Johnson*, No. 22-12504, 2024 WL 371954, at *3 (11th Cir. Feb. 1, 2024), cert. denied, --- U.S. ---, No. 23-7432, 2024 WL 2883853 (June 10, 2024) (citing *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (explaining that "a routine traffic stop is 'more analogous to a so-called "*Terry* stop" . . . than to a formal arrest.'").

> To establish reasonable suspicion, there must be a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. Courts must look at the totality of the circumstances of each case to determine whether the officer had a particularized and objective basis for suspecting legal wrongdoing. The officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant a stop. Even minor traffic violations qualify as criminal activity to provide an officer with reasonable suspicion to make a stop.

*Johnson*, No. 22-12504, 2024 WL 371954, at *3 (11th Cir. Feb. 1, 2024) (per curiam) (internal quotation marks omitted) (citations omitted).

> A traffic stop, which is a seizure within the meaning of the Fourth Amendment, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry* [*v. Ohio*, 392 U.S. 1 . . . (1968)]. . . . Law enforcement may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of motor vehicles. During a lawful traffic stop, officers also may take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course.

*United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) (some alterations adopted) (internal quotation marks omitted) (citations omitted).

Focusing on assumptions that the identity of the 911 caller is unknown and that the caller did not stop, Santiago-Marrero attempts to challenge the reliability of the 911 call and contends that the initial detention was unlawful. Santiago-Marrero did not provide support for her argument that an anonymous 911 call cannot provide probable cause or reasonable suspicion for an investigatory stop. In analyzing whether an anonymous 911 call was sufficiently reliable to support an investigatory stop of a truck that allegedly ran the 911 caller off the road, the Supreme Court stated:

> We have firmly rejected the argument that reasonable cause for an investigative stop can only be based on the officer's personal observation, rather than on information supplied by another person. Of course, an anonymous tip *alone* seldom demonstrates the informant's basis of knowledge or veracity. That is because ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations, and an anonymous tipster's veracity is by hypothesis largely unknown, and unknowable. But under appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop.

*Navarette v. California*, 572 U.S. 393, 397 (2014) (emphasis in original) (alterations adopted) (internal quotations marks omitted) (citations omitted) (finding 911 caller's identification of a silver Ford F–150 pickup with license plate 8D94925 was sufficiently reliable to stop a truck

near a mile marker that was 19 miles south of location reported in the 911 call, approximately 18 minutes after the call).[5]

Although the 911 caller in this case did not provide a license plate number, Santiago-Marrero is ignoring the detailed information that was provided by the caller; *i.e.*, that the vehicle was small, white, being driven by a male, *and had pulled over at mile marker 43 on I-75 south*. That is precisely the location where Sgt Touchton found Santiago-Marrero in a small, white Toyota at mile marker 43 on I-75 south. Further, as Sgt. Touchton pulled up behind the Toyota, a female passenger was exiting the vehicle to change places with a male driver.

Santiago-Marrero attempts to discredit the reliability of the 911 call, asserting that the caller's claim that their car was struck was false. Santiago-Marrero argues that:

> This fact [that the 911 caller's claim was false] was easily discernible first by the fact that the 911 caller did not stop and wait for law enforcement to arrive and view the damage to their car. Instead, the 911 caller simply drove on, foregoing any law enforcement assistance. It begs belief in this day and age that a driver whose vehicle is struck by another car would simply drive on and not meet with law enforcement about the incident to be sure it is fully documented.

(Doc. 77 at 2-3). Santiago-Marrero, however, assumes facts that are not in evidence. When Defense Counsel questioned Sgt. Touchton about the 911 caller, Sgt. Touchton's responses were essentially that he did not *personally* attempt to make contact with the 911 caller or attempt to locate the caller and he had no *personal* knowledge of what other personnel at CCSD might have done.[6] Regardless, the question is whether the 911 call was sufficiently reliable to provide

---

[5] "Another indicator of veracity is the caller's use of the 911 emergency system. A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette*, 572 U.S. at 400.

[6] Sgt. Touchton's testified:

> Q. That 911 caller never stopped, correct?
> A. Not as I know of, no, sir.
> Q. Okay. So no one ever said we've contacted the caller and they are at mile marker 45 or 49 or wherever, correct?
> A. I don't think so.
> Q. Never to be spoken of again, right?
> A. Not as I recall.
> Q. Okay. Nevertheless, the decision was made for you to try to locate the vehicle, the Corolla, correct?
> A. Yes, sir.
> Q. Was any attempt made to try to locate the 911 caller?

9

reasonable suspicion for an investigatory stop *at the time the stop was made*. *Terry v. Ohio*, 392 U.S. 1, 20 (1968) ("We must decide whether at that point [at the time the officer seized and searched petitioner] it was reasonable for [the officer] to have interfered with petitioner's personal security as he did.").

Based on the totality of the circumstances, this Court finds that the information provided by the 911 caller was sufficiently reliable for Sgt. Touchton to reasonably suspect that the Toyota stopped at mile marker 43 on I-75 south had been involved in a traffic violation which warranted Sgt. Touchton conducting an investigatory stop. Additionally, the Officer's personal observations upon arrival were consistent with the information provided by the 911 caller and enhanced by his observation of the occupants' conduct.

### B. The Investigatory Stop Was not Unnecessarily Prolonged

For a stop to remain lawful, it must be "reasonably related in scope to the circumstances which justified the interference in the first place" and "may not last any longer than necessary to process the traffic violation unless there is articulable suspicion of other illegal activity." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (internal quotation marks omitted) (citations omitted). "An officer may only prolong a traffic stop in special circumstances," such as: (1) "to investigate the driver's license and the vehicle registration," including by computer check, (2) in the interest of officer safety, to await the results of a criminal history check that is part of the routine traffic investigation, and (3) if he has "articulable suspicion of other illegal activity." *Id.* (internal quotation marks omitted) (citations committed). "During a lawful traffic stop, officers may also take steps that are reasonably necessary to protect their personal safety, including requiring the driver and passengers to exit the vehicle as a matter of course." *Spoerke*, 568 F.3d at 1248 (internal quotation marks omitted) (citations omitted).

---

A. Not on my part because I was right there at the vehicle.
Q. Okay. As far as you know did anyone at Cook County make any attempts to try [to] follow or get the 911 caller to stop?
A. No, sir, not to my knowledge.

Tr. 18:3—21.

In *United States v. Campbell*, 26 F.4th 860, 885 (11th Cir.), *cert. denied*, 143 S. Ct. 95 (2022), the Eleventh Circuit, sitting *en banc*, analyzed the Circuit's precedent as to the standard for addressing unlawfully prolonged traffic stops. The Eleventh Circuit stated:

> [C]ourts must look at what an officer actually does: if he can complete traffic-based inquiries expeditiously, then that is the amount of time reasonably required to complete the stop's mission. And a traffic stop prolonged beyond that point is unlawful. Put simply, a stop can be unlawfully prolonged even if done expeditiously.
>
> . . .
>
> The proper standard for addressing an unlawfully prolonged stop, then, is this: a stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes. In other words, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) *without reasonable suspicion*.

*Id.* at 883–84 (alteration adopted) (emphasis added) (internal quotation marks omitted) (citations omitted).

Santiago-Marrero asserts that the only reason Sgt. Touchton had for approaching the Toyota was to check the front of the Toyota to determine if there was any damage consistent with the 911 caller's statements. Santiago-Marrero then asserts that without checking the front of the Toyota, Sgt. Touchton illegally detained Defendants, waiting on backup to arrive, simply because Sgt. Touchton saw Santiago-Marrero and Cartagena-Soto changing seats. If these were all the facts, this would be a very simple case. However, Santiago-Marrero chooses to ignore the reason Sgt. Touchton was delayed in checking the front of the vehicle and his statement, under oath, as to why he called for backup.

Sgt. Touchton testified that in his experience—about thirty years in law enforcement—"Normally when people swap seats, one of them is suspended or something is going on that, you know, is not law abiding." Tr. 7:23—25. Further, when Sgt. Touchton started approaching the car, he had to tell Santiago-Marrero several times to get back in the car. Even then, she did not get back in the car, but stood outside on the passenger side of the Toyota. From the Court's review of the Video prior to Deputy Exum arriving at the Location, Sgt. Touchton had to tell Santiago-Marrero four times to get back in the Toyota. She was continually moving around the vehicle attempting to approach Sgt. Touchton. When he removed the black bag

11

from the Toyota, Sgt. Touchton spent only fifteen seconds looking in the bag because, for his own safety, he had to keep his attention on the Defendants. *See* Tr. 24:1—6; *Spoerke*, 568 F.3d at 1248 (during a lawful traffic stop, officers may take steps to protect their own safety). Further, Sgt. Touchton was dealing with two individuals who would not provide him with their identity. It is not surprising that Sgt. Touchton did not immediately check the front of the vehicle.

Any extension of the investigatory stop was the result of Santiago-Marrero's and Cartagena-Soto's actions in refusing to provide their identities and failing to obey Sgt. Touchton's instructions to remain in the Toyota. Those instructions were given not only for Sgt. Touchton's safety, but were also given for the Defendants' safety—particularly where they were stopped on the side of a busy interstate highway. *See* Video generally. The video also clearly reflects that when Sgt. Touchton finally received the Defendant's identification information, he immediately called in the information to dispatch.

Santiago-Marrero's assertion that Sgt. Touchton should have immediately checked the front of the Toyota and then let Defendants proceed on their way is totally without merit. It is clear that Sgt. Touchton was within the limits of conducting a lawful traffic stop when he sought to obtain the drivers' licenses and identification of Santiago-Marrero and Cartagena-Soto. It was also proper for him to await the results of a criminal history check. *Boyce*, 351 F.3d at 1106. Santiago-Marrero's assertions that Sgt. Touchton prolonged the stop to wait for backup is simply incorrect. Deputy Exum arrived at the Location while Sgt. Touchton was lawfully waiting on dispatch to run the checks and relay information back to Sgt. Touchton.

### C. The Officers had reasonable suspicion of other illegal activity justifying a prolonged investigatory stop and they had probable cause to conduct a warrantless search of the Toyota.

Under *Boyce*, a traffic stop or investigatory stop, based on a traffic violation, may be legitimately extended if an officer has "articulable suspicion of other illegal activity." *Boyce*, 351 F.3d at 1106 (internal quotation marks omitted) (citations committed). As noted above, the Eleventh Circuit provided further guidance on prolonging a traffic stop on suspicion of other illegal activity in *Campbell* where it stated: "[T]o unlawfully prolong, the officer must (1)

conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without reasonable suspicion. *Campbell*, 26 F.4th at 884.

"While it is true that the Fourth Amendment generally requires law enforcement officials to obtain a warrant before conducting a search, there is what has become known as the automobile exception to the warrant requirement." *United States v. Watts*, 329 F.3d 1282, 1284 (11th Cir. 2003). "There are only two questions that must be answered in the affirmative before authorities may conduct a warrantless search of an automobile. The first is whether the automobile is readily mobile. All that is necessary to satisfy this element is that the automobile is operational. . . . The second prong of the test, probable cause, is determined under the facts of each case." *Id.* at 1286.

It is undisputed that the Officers did not have consent to search the Toyota. "[T]he burden of excusing the failure to get a warrant falls upon the Government, which must point to the specific exception(s) under which it proceeded." *United States v. Freire*, 710 F.2d 1515, 1522 (11th Cir. 1983). Deputy Exum testified that he believed he had probable cause to search the Toyota based on the odor of marijuana that he had smelled coming from the Toyota and the drug paraphernalia he had found in the black bag. Santiago-Marrero contends that Deputy Exum's uncorroborated claim that he smelled marijuana is not credible and is insufficient to establish reasonable suspicion to prolong the stop or establish probable cause for the search. Santiago-Marrero bases this assertion on Sgt. Touchton's failure to have also smelled the marijuana even though he was closer to the vehicle for a longer time and had even leaned inside the vehicle. According to Santiago-Marrero, Sgt. Touchton's testimony that he could not smell that day because of his sinus problems is also not credible.

As the Government points out and as Deputy Exum testified, he had extensive training in interdiction and drug paraphernalia. He had extensive training in identifying marijuana by smell and had made hundreds of arrests for marijuana during his career. There is no evidence to support Santiago-Marrero's contention that Deputy Exum's testimony is false. Further, Sgt. Touchton provided credible testimony that he did not smell the marijuana because of his sinus problems. Santiago-Marrero presented no evidence, medical or otherwise, that Sgt. Touchton could not have been suffering from sinus problems on the day he stopped the Defendants and

13

that such problems could have prevented him from smelling the marijuana. Sgt. Touchton's explanation is not challenged by any factual evidence or circumstances.

Santiago-Marrero next argues that even if Deputy Exum did smell marijuana, that alone is insufficient in Georgia to provide probable cause or reasonable suspicion of a crime for him to conduct a search of the Toyota. Santiago-Marrero notes that "[o]n May 10, 2019, Governor Kemp signed the Georgia Hemp Farming Act [the "Act"] into law. O.C.G.A. § 2-23-1 et seq. (2023). The Act essentially defined 'hemp' as a subset of 'marijuana,' and legalized hemp." (Doc. 75 at 12) Santiago-Marrero cites articles and two unreported district court cases noting the smoke of hemp and marijuana smell the same.[7] Santiago-Marrero contends that because it was no longer illegal to smoke hemp when she was stopped in 2021, that Deputy Exum could have smelled hemp instead of marijuana. According to Santiago-Marrero, "[t]he Officers had no additional evidence to indicate that it was marijuana [Deputy Exum] allegedly smelled. Therefore, [according to Santiago-Marrero, the Officers] did not have a reasonable suspicion that Ms. Santiago-Marrero was committing a crime such that evidence of a crime would likely be found inside the vehicle." (Doc. 75 at 14) The Court finds Santiago-Marrero's argument unpersuasive.[8]

In the cases cited by Santiago-Marrero, the courts merely note that hemp and marijuana smoke are similar or easily confused. Neither case finds that the smell of marijuana alone is insufficient to provide reasonable suspicion that an individual in Santiago-Marrero's position was committing a crime such that evidence of a crime would likely be found during a search. Nor would such a finding based on the law of the States of New York or Indiana, be binding on or persuasive to this Court[9]—particularly in light of contrary rulings by the Georgia Court

---

[7] The cases are out of the Seventh and Second Circuit: *C. Y. Wholesale, Inc. v. Holcomb*, 2019 WL 7497135, at *6–7 (S.D. Ind. 2019), *rev'd and remanded*, 965 F.3d 541 (7th Cir. 2020); *see also United States v. Bignon*, 2019 WL 643177, at *4 (S.D.N.Y. 2019), *aff'd*, 813 F. App'x. 34 (2d Cir. 2020) ("it is reasonable to infer that the smell of burning hemp and the smell of burning marijuana are easily confused").

[8] In her reply brief, Santiago-Marrero notes that "the government simply ignores the argument that Lt. Exum could not tell the difference in odor between legal hemp and illegal marijuana. The argument and analysis in Ms. Santiago-Marrero's post-hearing brief remain valid and unrebutted." (Doc. 77 at 4) Even if a parties' argument is unrebutted by the opposing party, the Court performs its own research and analysis as to whether a parties' argument is "valid" or persuasive.

[9] In fact, the court in *Bignon*, found that there was probable cause to arrest Bignon for unlawful possession of marijuana. 2019 WL 643177, at *3. In making its finding, the court stated:

14

of Appeals made after enactment of the Act. *See State v. Johnson*, 873 S.E.2d 709, 711 (Ga. Ct. App. 2022) (reversing in part the trial court's erroneous ruling and stating that "the odor of marijuana alone may provide probable cause for a warrantless search of an automobile"); *Gowen v. State*, 860 S.E.2d 828, 831 (Ga. Ct. App. 2021) (considering the provisions of the Act and finding that the "smell of burnt marijuana in [defendant's] van provided police with probable cause to search that vehicle.").

In addition, the United State Supreme Court has recognized, that a search can be reasonable and therefore justified under the Fourth Amendment by an officer's mistaken belief, if that mistake is objectively reasonable.

> The Fourth Amendment prohibits "unreasonable searches and seizures." Under this standard, a search or seizure may be permissible even though the justification for the action includes a reasonable factual mistake.
>
> . . .
>
> . . . The question here is whether reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition. We hold that it can.
>
> As the text indicates and we have repeatedly affirmed, the ultimate touchstone of the Fourth Amendment is "reasonableness." To be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them fair leeway for enforcing the law in the community's protection. We have recognized that searches and seizures based on mistakes of fact can be reasonable. . . .
>
> But reasonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: The facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

---

> [T]he parties' dispute whether Bignon's arrest was consistent with the NYPD's policies regarding marijuana possession. But whether it was or not is irrelevant to the question of whether there was probable cause for the arrest for purposes of the Fourth Amendment. *See, e.g., Moore*, 553 U.S. at 176 ("[W]hile States are free to regulate [warrantless] arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").

*Bignon*, No. 18-CR-783 (JMF), 2019 WL 643177, at *3 n.3 (S.D.N.Y. Feb. 15, 2019), *aff'd*, 813 F. App'x 34 (2d Cir. 2020).

15

*Heien v. North Carolina*, 574 U.S. 54, 57, 60–61 (2014). Under *Heien*, even if Deputy Exum reasonably—but mistakenly—believed he smelled marijuana and the product seized had actually been legal hemp, his search of the Toyota would still be lawful. *See also United States v. Williams*, 731 F. App'x 863, 867 (11th Cir. 2018) ("In a long line of cases, we have held that the smell of marijuana coming from a person's house or vehicle establishes probable cause for a search." (citing cases)). Officer Exum's extensive law enforcement experience, specifically with marijuana, is consistent with this principle.

As such, and as shown by the totality of the circumstances, the Officers had a reasonable suspicion and articulable basis on which to prolong the valid investigatory stop and they had probable cause to search the Toyota.

### D. Inevitable Discovery Exception.

The Court has found that the investigatory stop was lawful, that the stop was not unnecessarily prolonged, but rather that the Officers had reasonable suspicion and an articulable basis on which to prolong the valid investigatory stop, and the Officers had probable cause to search the Toyota. Thus, the Court need not, and does not, address the Government's alternative argument that the evidence obtained in the search of the Toyota is admissible under the "inevitable discovery exception."

## IV. CONCLUSION

Accordingly, for the foregoing reasons and based upon the totality of the circumstances as shown by the evidence presented, Defendant Bertha Theresa Santiago-Marrero's Motion to Suppress (Doc. 56) is **DENIED**.

**SO ORDERED**, this 3rd day of July 2024.

/s/W. Louis Sands
W. LOUIS SANDS, SR. JUDGE
UNITED STATES DISTRICT COURT